UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| MINDY MARX, | ) | |
|   Plaintiff, | ) | |
| | ) | |
|  vs. | ) | 3:05-cv-108 RLY-WGH |
| | ) | |
| WHIRLPOOL CORPORATION, | ) | |
|   Defendant. | ) | |

**ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Mindy Marx, filed this action against her former employer, Whirlpool Corporation, alleging that Whirlpool violated the Family Medical Leave Act ("FMLA"), Title VII of the Civil Rights Act of 1964, and the Americans With Disabilities Act of 1990. Plaintiff, in her response, voluntarily dismissed her Title VII and ADA claims. Accordingly, Defendant's Motion for Summary Judgment addresses only her FMLA claims.

For the reasons explained below, the court hereby **GRANTS** Defendant's Motion.

**I. Summary Judgment Standard**

Summary judgment shall be granted if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Black v. Henry Pratt Co.*, 778 F.2d 1278, 1281 (7th Cir. 1985). The moving party has the burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 106 S.Ct. 2548, 2553 (1986). A genuine issue of material fact

1

exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 106 S.Ct. 2505, 2511 (1986). In determining whether a genuine issue of a material fact exists, the evidence is to be taken in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 90 S.Ct. 1598, 1608 (1970). Once the moving party has met its burden, the opposing party must come forward with specific evidence, not mere allegations or denials of the pleadings, which demonstrates that there is a genuine issue for trial. *Posey v. Skyline Corp.*, 702 F.2d 102, 105 (7th Cir. 1983).

**II.     Facts**

    **A.     Background**

1. On March 25, 2002, Plaintiff began working as an hourly employee at Whirlpool's Evansville, Indiana facility, and was a member of the Union, Local 808. (Deposition of Mindy Marx ("Plaintiff Dep.") at 3, 49).

2. Whirpool's FMLA Policy provides that an employee may take qualifying leave to care for a son or daughter with a serious heath condition if the employee has at least 12 months of service with the Company and has worked more than 1250 hours in the preceding year.  (Plaintiff Dep. at 65-66; Plaintiff Dep. Ex. 6).

3. Pursuant to that policy, Plaintiff applied for intermittent FMLA for her son, Ryan Marx, in March of 2004. (Plaintiff Dep. at 73, 79-81).

4. Ryan suffers from severe attention deficit hyperactivity disorder ("ADHD") and other unspecified behavioral disorders.  (Plaintiff Dep. at 88).

5. On March 26, 2004, Whirlpool approved Plaintiff's request for dependent care intermittent FMLA leave to care for Ryan four or five days per month. (Plaintiff Dep. at 79-81; Plaintiff Dep. Ex. 9).

6. Pursuant to Whirlpool's Attendance Policy, an employee must call in and notify the Company each time she is absent. (Plaintiff Dep. at 65; Plaintiff Dep. Ex. 6). If an employee follows the proper call-in procedure, an employee is assessed one point. (Plaintiff Dep. at 65; Plaintiff Dep. Ex. 6).

7. If the employee obtains ten points, the employee is issued a final letter warning. (Plaintiff Dep. at 66; Plaintiff Dep. Ex. 6; Deposition of Deborah Castrale ("Castrale Dep.") at 32).

8. If the employee obtains more than ten points in one year, the employee is terminated. (Plaintiff Dep. at 65; Plaintiff Dep. Ex. 6; Castrale Dep. at 32).

9. On June 21, 2004, Joel West, Whirlpool Supervisor of Employee Relations, issued Plaintiff a 10-Point Final Letter pursuant to Whirlpool's Attendance Policy. (Deposition of Joel West ("West Dep.") at 17-19; Company Deposition ("Company Dep.") Ex. 29; Plaintiff Dep. at 130).

10. Plaintiff challenged the issuance, indicating that the points should roll back to eight pursuant to Company Policy, which provides that an employee must be told within 10 working days that a Final Letter is pending, or the Final Letter is null and void. (Plaintiff Dep. at 30).

11. West refused to listen to Plaintiff, so Plaintiff left his office. (Affidavit of Mindy

Marx ("Marx Aff.") ¶¶ 2-5).

12. Shortly after the meeting, Plaintiff was informed by Theresa Barrett, the Union's First Shift Chief Steward, that Plaintiff had "pissed off" West and now he was "looking to put her out." (Plaintiff Dep. at 152).

13. Barrett and Jo Relleke, Whirlpool's former FMLA coordinator, informed Plaintiff's fiancé, Peter Clark, that West was "watching" Plaintiff. (Affidavit of Peter Clark ¶¶ 1, 2).

14. It is undisputed that all ten points were for unexcused absences and that she was not assessed any attendance points for taking FMLA. (Plaintiff Dep. at 153-54).

**B. Events Surrounding August 13, 2004**

15. On Friday, August 13, 2004, Plaintiff and Clark were observed stopping by the plant on two separate occasions over the course of a few hours to pick up their paychecks. (Plaintiff Dep. at 112-14).

16. The first time Plaintiff and Clark stopped by, Whirlpool's payroll department was closed for lunch. (Plaintiff Dep. at 112-13).

17. On both occasions, Relleke saw Plaintiff and Clark at the plant. (Plaintiff Dep. at 121-22; Deposition of Jo Relleke ("Relleke Dep.") at 34-35; West Dep. at 22).

18. Despite the fact that both Plaintiff and Clark worked on first shift, Relleke noted that neither Plaintiff nor Clark appeared to be working on August 13, 2004. (Relleke Dep. at 36-37, 47).

19. Relleke knew from her role as FMLA coordinator that Plaintiff had dependent care

4

        FMLA for her son, Ryan. (Relleke Dep. at 47). However, Relleke did not see Ryan with Plaintiff on either occasion. (Relleke Dep. at 36-37, 47; West Dep. at 22).

20. Relleke therefore reported what she had seen to West. (Relleke Dep. at 36-37, 47; West Dep. at 22).

21. After receiving the information from Relleke, West contacted Plaintiff's supervisor, Brenda Sandefur, and asked her to contact him on Monday, August 16, 2004, if Plaintiff claimed FMLA for Friday, August 13, 2004. (West Dep. at 24; Declaration of Brenda Sandefur ("Sandefur Dec.") ¶ 2).

22. On Monday, August 16, 2004, Plaintiff returned to work. (Plaintiff Dep. at 123).

23. Upon her return to work, Plaintiff told Sandefur that her absence on August 13, 2004, was FMLA qualifying. Sandefur reported this information to West. (West Dep. at 24; Sandefur Dec. ¶ 3).

24. Plaintiff's claim that her August 13, 2004 absence was FMLA qualifying raised suspicions because Plaintiff's only FMLA leave was intermittent dependent care for her son, Ryan, and she was seen at the plant on two separate occasions over the course of a few hours during her shift without Ryan. (Castrale Dep. at 42, 47; West Dep. at 24-25).

25. On August 18, 2003, West requested a meeting with Plaintiff, Sandefur and her Union District Steward, Steve Benson, in the Human Resources Department. (Plaintiff Dep. at 124-25; West Dep. at 25; Declaration of Steve Benson ("Benson

Dec.") ¶ 2).

26. During the meeting, West explained to Plaintiff that the Company had some questions regarding Plaintiff's claim that her absence on Friday, August 13, 2004, was FMLA qualifying because, despite the fact that she had intermittent FMLA leave for her son, Ryan, she had been seen at the plant that day on two separate occasions over a period of a few hours during her shift trying to pick up her paycheck, without her son.  (Plaintiff Dep. at 126; West Dep. at 26).

27. Plaintiff responded that Ryan was absent from school on August 13, 2004, and that her father was watching him while she ran errands.  (Plaintiff Dep. at 127; Castrale Dep. at 44; West Dep. at 26; Benson Dec. ¶ 4).

28. Plaintiff then told West that Ryan was in school on August 13, 2004, and that she was making arrangements for a change in his care.  (Plaintiff Dep. at 127-28, 132, 134-35, and 139; Deposition of Peter Clark ("Clark Dep." at 41, 46).  Specifically, Plaintiff testified that she took August 13, 2004 off to seek information about different child psychiatrists.  (Plaintiff Dep. at 91-93; Clark Dep. at 25, 33).  Ryan's doctor, Dr. Angela Rogan, told Plaintiff that her son needed to see a child psychiatrist because she was concerned with the combination of drugs he was currently taking for his ADHD.  (Deposition of Angela Rogan "Rogan Dep.") at 39-42).

29. Plaintiff testified that she contacted Southwestern Mental Health, Green River Valley Behavioral Health Center ("GRVBHC") in Owensboro, Kentucky,

Welborn Health Plans, and Dr. Rogan by telephone on the morning of August 13, 2004. (Plaintiff Dep. at 93, 96, 107). However, Plaintiff admits there are no telephone records to corroborate her claim. (Plaintiff's Responses to Whirlpool's Second and Third Set of Requests for Admission, Defendant's Exs. 14, 15).

30. West requested that Plaintiff sign an authorization to enable Whirlpool to obtain her son's school attendance records for August 13, 2004, to substantiate Plaintiff's claim that her son was not in school that day and to confirm her need for dependent care FMLA. (Plaintiff Dep. at 129; West Dep. at 26-27; Company Dep. Ex. 30).

31. Plaintiff signed the authorization because "[West] said that if I didn't sign it then I was going to be terminated right then." (Plaintiff Dep. at 129, 131).

32. West approved Plaintiff's August 13, 2004 absence as FMLA. (West Dep. at 48-49).

33. Thereafter, West contacted the school and faxed the authorization to obtain Ryan's August 13, 2004 attendance record. (Castrale Dep. at 45; West Dep. at 30).

34. Whirlpool did not receive Ryan's attendance records for August 13, 2004. (West Dep. at 31).

35. West contacted the school to determine the whereabouts of the records. (West Dep. at 31).

36. According to Ryan's school, Plaintiff had contacted the school and revoked the authorization. (Castrale Dep. at 44-45; West Dep. at 31-32).

7

37. On August 20, 2004, West convened another meeting with Plaintiff, Sandefur, Benson and Barrett. (Castrale Dep. at 45; West Dep. at 34; Plaintiff Dep. at 136-37; Sandefur Dec. ¶ 4; Benson Dec. ¶ 2; Declaration of Theresa Barrett ("Barrett Dec.") ¶ 2).

38. During the meeting, West questioned Plaintiff as to why she revoked the authorization and again requested that she release Ryan's school attendance record of August 13, 2004. (Plaintiff Dep. at 137; West Dep. at 33).

39. Plaintiff refused to provide the information relating to Ryan's school attendance. (Plaintiff Dep. at 138-39; West Dep. at 33).

40. West went to Deborah Castrale, Whirlpool Manager of Human Resources and Employee Relations, and told her that Plaintiff would not sign the release. (West Dep. at 36).

41. West and Castrale determined that Plaintiff's August 13, 2004 absence was not FMLA qualifying, and assessed Plaintiff one point under Whirlpool's Attendance Policy. (West Dep. at 35-37).

42. This was Plaintiff's 11th attendance point under Whirlpool's Attendance Policy and consequently, on August 26, 2004, Plaintiff was suspended pursuant to that policy. (Plaintiff Dep. at 140; West Dep. at 36-37; Sandefur Dec. ¶ 6).

43. On August 30, 2004, a Fact-Finding Meeting was held with Plaintiff. (Plaintiff Dep. at 141). West, Sandefur and two note takers, Greg Cullison and Jodie Meyer, were present from Whirlpool. (West Dep. at 38; Plaintiff Dep. at 141; Sandefur

      Dec. ¶ 7; Declaration of Jodie Meyer ("Meyer Dec.") ¶¶ 2-3; Declaration of Greg Cullison ("Cullison Dec.") ¶ 2. Present from the Union to represent Plaintiff were Benson, Barrett and the Union Shop's Chairman, Ronnie Watson. (Plaintiff Dep. at 141; West Dep. at 38; Benson Dec. ¶ 3; Barrett Dec. ¶¶ 3-5; Declaration of Ronnie Watson ("Watson Dec.") ¶¶ 2-4). Both Watson and Barrett took notes during the meeting. (Barrett Dec. ¶ 4; Watson Dec. ¶ 3).

44. West explained the reasons for the meeting and again requested Plaintiff to verify her absence by providing him with Ryan's attendance record. (Plaintiff Dep. at 142).

45. Plaintiff did not provide the same. (Plaintiff Dep. at 142).

46. Plaintiff also stated that she had already been granted FMLA leave for August 13, 2004. (West Dep. at 45).

47. West explained that any approval was conditioned upon Whirlpool receiving documentation to support her August 13, 2004 absence. (West Dep. at 45).

48. West testified that he didn't think to give Plaintiff any alternatives to verify her absence because it was his understanding that Ryan was at home on August 13, 2004. West further testified that he would have accepted other documentation from Plaintiff, such as a doctor's statement, verifying that she was at home with Ryan. (Plaintiff Dep. at 46, 63).

49. After reviewing all the evidence, West and Castrale terminated Plaintiff's employment on September 2, 2004, in accordance with Whirlpool's Attendance

9

Policy. (Plaintiff Dep. at 144, 147, 149; West Dep. at 57-58; Company Dep. Ex. 35).

### III. Discussion

#### A. Substantive Rights Claim Under the FMLA

Plaintiff alleges that Whirlpool interfered with the exercise of her rights under the FMLA (Count I), and that Whirlpool failed to restore her in her position at Whirlpool after the utilization of her FMLA leave (Count III).

The FMLA grants eligible employees the right to take leave of up to twelve work weeks in any twelve-month period "in order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition." 29 U.S.C. § 2612(a)(1)(C). After return from a leave taken "for the intended purpose of the leave," the employee "shall be entitled . . . to be restored by the employer to the position of employment held by the employee when the leave commenced." 29 U.S.C. § 2614(a)(1). The Act makes it unlawful for an employer "to interfere with, restrain, or deny the exercise of or the attempt to exercise" this right. 29 U.S.C. § 2615(a)(1).

##### 1. Whirlpool's Honest Suspicion

Whirlpool argues that its honest suspicion that Plaintiff had violated Company policy by taking August 13, 2004, off for personal, rather than FMLA-qualifying reasons, justified Plaintiff's termination. "[A]n employer's honest suspicion that the employee was not using h[er] medical leave for its intended purpose is enough to defeat the

employee's substantive right FMLA claim." *Crouch v. Whirlpool*, 447 F.3d 984, 986 (7th Cir. 2006) (citing *Kariotis v. Navistar Int'l Transp. Corp.*, 131 F.3d 672, 681 (7th Cir. 1991)).

The summary judgment record reflects that Plaintiff was using her day off as a vacation day, not to make arrangements for Ryan's prescribed change in care. Whirlpool's suspicion arose due to the fact that on August 13, 2004, Plaintiff was seen at the plant twice over a span of a few hours during her shift to pick up her paycheck. Whirlpool was aware that Plaintiff's only FMLA was for dependent care FMLA for her son, Ryan. When Whirlpool questioned Plaintiff regarding her August 13, 2004 absence, she claimed that it was FMLA-qualifying because Ryan was out of school that day and was at home with her father while she ran errands. She then changed her story and said that Ryan was in school and that she was using August 13, 2004, as a day to make arrangements for her son's change in care. Whirlpool asked for evidence of Ryan's attendance on August 13, 2004. Plaintiff alleges that West forced her to sign a release allowing Whirlpool to obtain those records from Ryan's school. Whether Plaintiff was forced to sign it or not, the fact remains that Plaintiff later called the school and revoked her authorization. Whirlpool had several meetings with Plaintiff throughout the course of its investigation, asking Plaintiff for evidence of Ryan's attendance. She failed to provide the same. Accordingly, Castrale and West believed that Plaintiff's August 13, 2004 absence was not FMLA-qualifying. Consequently, Plaintiff received her 11th attendance point under Whirlpool's Attendance Policy. She was initially suspended and later

11

terminated for a violation of that policy.

Plaintiff challenges Whirlpool's honest suspicion by arguing that West was "monitoring" Plaintiff and "looking for a reason to terminate Plaintiff." (Plaintiff's Response at 24). The evidence reflects that West was angry at Plaintiff for walking out of his office on June 21, 2004, after he issued her the 10-Point Final Letter. Clark also testified that he heard from Barrett and Relleke that West was "watching" Plaintiff. To the extent this is true, this evidence does not preclude a finding that West had an honest suspicion that she was not taking the day to make a change in care for her son, since West's comments were not made contemporaneously with Plaintiff's termination nor in reference to terminating Plaintiff for her use of FMLA. *See Haywood v. Lucent Tech., Inc.*, 323 F.3d 524, 530 (7th Cir. 2003) (supervisor's bigoted remarks not made contemporaneously with or in reference to plaintiff's termination could not support direct evidence of race discrimination).

Even if the comments could be construed as evidence that West was looking for a reason to terminate Plaintiff, and required verification of Plaintiff's August 13, 2004 absence as a means to that end, West was not the sole decision-maker. The undisputed facts confirm that both West and Castrale made the decision to terminate Plaintiff. There is no evidence that Castrale did not honestly believe that Plaintiff's August 13, 2004 absence was not FMLA-qualifying or that the decision-making process was "tainted."

### 2. "Care" for Ryan

Whirlpool also argues that Plaintiff failed to show that she "needed to care for" her

son, Ryan, on August 13, 2004. The term "needed to care for" comes from the FMLA's governing regulations, which provide, in relevant part: "The medical certification provision that an employee is "needed to care for" a family member encompasses both physical and psychological care." 29 C.F.R. § 825.116(a). The term "needed to care for" also includes situations "where the employee may be needed to . . . make arrangements for changes in care . . ." 29 C.F.R. § 825.116(b).

Despite the fact that there are no telephone records to corroborate her claim, Plaintiff contends that she made four telephone calls to arrange for the change in care of her son. These telephone calls, which all occurred on the morning of August 13, 2004, were to Southwestern Mental Health, GRVBHC, Dr. Rogan, and Welborn Health Plans. Plaintiff admits that these four telephone calls were the only thing she did related to Ryan's change in care on August 13, 2004. Plaintiff did not personally visit Southwestern Mental Health, GRVBHC, Dr. Rogan, or Welborn Health Plans. (Plaintiff Dep. at 118). Rather, it is undisputed that she spent the remainder of her shift picking up her paycheck, visiting her father's house, cashing her paycheck, and caring for her youngest son, River. (Plaintiff Dep. at 112-15). There was thus no imminent reason or emergency that required Plaintiff to specifically take off work or even make these alleged telephone calls on August 13, 2004. (Plaintiff Dep. at 91-92, 120). Plaintiff's substantive rights claims (Counts I and III) are therefore dismissed.

**B.     Retaliation**

Plaintiff alleges that Whirlpool retaliated against her for the exercise of her rights

under the FMLA (Count II). Plaintiff chooses to establish her claim under the direct method of proof. The Seventh Circuit analyzes an FMLA retaliation claim the same way it analyzes a Title VII retaliation claim. *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004). Thus, Plaintiff must show that (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action by the employer; and (3) there is a causal connection between the protected activity and the adverse action. *Id*. Under the direct method, circumstantial evidence must "itself show that the decision-maker acted because of the prohibited animus." *See Venturelli v. Arc Comm. Serv., Inc.*, 350 F.3d 592, 601 (7th Cir. 2003).

Whirlpool contends that Plaintiff did not engage in statutorily protected activity. Pursuant to Title VII, it unlawful "for an employer to discriminate against any of his employees . . . because [s]he *has opposed any practice made an unlawful employment practice by this subchapter*, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a) (emphasis added).

Plaintiff claims that her protected activity was opposing Whirlpool's attempts to obtain her son's August 13, 2004 attendance record.[1] This is not protected activity under the definition cited above. There is nothing unlawful about Whirlpool seeking Ryan's school attendance record for August 13, 2004, as a way to verify her absence. Indeed,

---

[1] In support of her argument, Plaintiff cites to page 142 of her deposition, which reads: "[West] asked me why I did not want him to have my son's attendance record, and I told him that's not the proper way to verify FMLA."

14

Plaintiff does not dispute that an employer may seek clarification of an employee's leave. 29 C.F.R. § 825.308.

Moreover, Plaintiff has failed to establish that the decision-makers, West and Castrale, acted with retaliatory animus. Rather, the evidence confirms that West and Castrale had a good faith belief that Plaintiff's August 13, 2004 absence was not FMLA-qualifying. As stated previously, even if West had a retaliatory animus, it is undisputed that Castrale did not. And there is no evidence that West tainted Castrale's decision in any way.

Accordingly, Plaintiff's FMLA retaliation claim (Count II) must be dismissed.

## IV. Conclusion

For the reasons stated above, the court hereby **GRANTS** Whirlpool Corporation's Motion for Summary Judgment.

**SO ORDERED** this 28th day of November 2006.

_____
RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Electronic Copies to:

Tanya L. Castrogiovanni
LITTLER MENDELSON
tcastrogiovanni@littler.com

15

Andrew Dutkanych III
BIESECKER & DUTKANYCH LLC
ad@bdlegal.com

Garrison L. Phillips
LITTLER MENDELSON, P.C.
gphillips@littler.com

Marissa Ross
LITTLER MENDELSON, P.C.
maross@littler.com

16